1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11   ABEL VALENCIA,                          )   Case No.: 1:12-cv-01446-AWI-SAB (PC)
                                             )
12                  Plaintiff,               )
                                             )   **FINDINGS AND RECOMMENDATIONS**
13          v.                               )   **RECOMMENDING DEFENDANTS' MOTION**
                                             )   **FOR SUMMARY JUDGMENT BE GRANTED**
14   RUIZ, et.al.,                           )
                                             )   [ECF Nos. 85 & 86]
15                  Defendants.              )
                                             )
16   _____)

17          Plaintiff Abel Valencia is appearing pro se and in forma pauperis in this civil rights action

18   pursuant to 42 U.S.C. § 1983.  This matter was therefore referred to a United States magistrate judge

19   pursuant to 28 U.S.C. § 636(1)(B) and Local Rule 302, due to the decline of magistrate judge

20   jurisdiction by Plaintiff.  (ECF No. 7.)

21          Currently before the Court is Defendants' motion for summary judgment, filed December 11,

22   2015.

23                                          **I.**

24                                   **RELEVANT HISTORY**

25          This is action is proceeding on a claim for damages against Defendants Ruiz for violation of

26   Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment, and an official capacity

27   claim for injunctive relief against Defendant Scott Kernan-successor of Jeffrey Beard.

28

                                            1

On April 18, 2014, the Court issued an order adopting Findings and Recommendations allow Plaintiff to proceed only as to claims against Defendant D.J. Ruiz for retaliation and against Defendants D.J. Ruiz, A. Mayo, J.C. Garcia, J.C. Smith, S. Johnson and an unknown Institutional Gang Investigator ("IGI") for violation of Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment.

Defendants filed an exhaustion-related motion for summary judgment on December 16, 2014. On May 8, 2015, the undersigned issued Findings and Recommendations recommending that Defendants' motion for summary be granted as to the retaliation claim against Defendant Ruiz, and as to the Due Process claims against Defendants Mayo, Garcia, Smith and Johnson.  (ECF No. 65.)  On September 11, 2015, the Findings and Recommendations were adopted in full, and the matter was referred back to the undersigned to resolve the due process claim against Defendant Ruiz.  (ECF No. 76.)

On July 24, 2015, Plaintiff filed a motion to amend.  (ECF No. 71.)  On December 3, 2015, Plaintiff's motion to amend was granted and Plaintiff's official capacity claim against Defendant Jeffrey Beard (now Scott Kernan as successor) for injunctive relief was reinstated.  (ECF No. 83.)

On December 11, 2015, Defendant Ruiz filed a motion for summary judgment.  (ECF No. 85.) On December 14, 2015, an amended motion was filed with supporting memorandum of points of authorities previously omitted from the December 11, 2015, filing.  (ECF No. 86.)

Defendant Scott Kernan, in official capacity as successor to Jeffrey Beard, filed an answer to the complaint, and joined in Defendant Ruiz's motion for summary judgment.  (ECF Nos. 101 & 102.)

Plaintiff filed an opposition to Defendants' present motion for summary judgment on March 25, 2016, and after receiving an extension of time, Defendants filed a reply on April 8, 2016.  (ECF Nos. 103, 105, 106.)

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v.

U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

## III.

## DISCUSSION

### A.      Summary of Complaint Allegations

According to the complaint, on April 24, 2011, Defendant Ruiz had Plaintiff pulled out of his cell and placed in a holding cell for a formal interview regarding possible safety concerns.  The interview consisted of the following questions and answers: (1) Does Plaintiff have safety concerns?  Plaintiff answered no; (2) Can Plaintiff program safely in general population? Plaintiff answered yes; (3) Can Plaintiff have a cellmate? Plaintiff answered yes; (4) Does Plaintiff want a cellmate? Plaintiff answered yes; (5) Are you going to tell me what happened on April 13, 2011? Plaintiff exercised his right to remain silent and had no comment regarding the matter.  Defendant Ruiz stated "so you['re] one of those guys" meaning Plaintiff chose to remain silent and now answer his last question.  In retaliation, Defendant Ruiz decided to search Plaintiff's cell and tossed his personal property around.

After the search, Defendant Ruiz advised Plaintiff that a gang validation package would be prepared because Plaintiff "stayed quiet" about the incident on April 13, 2011.

3

On May 2, 2011, Defendant Ruiz, among others, went to Plaintiff's cell to take photographs for purposes of the validation process.

On May 3, 2011, Defendant Ruiz, among others, went to Plaintiff's cell to re-take the photographs.  After the search, Plaintiff was escorted to the sergeant's office.  Plaintiff informed the prison officials that he had no safety concerns and Ruiz stated "I don't care about that that's not why I'm here."  Plaintiff told the officials that he had nothing to say and Ruiz stated "I don't care whether you have nothing to say you['re] going to stand here and listen to me whether you like it or not!"  The sergeant and Ruiz stated we will "see how you'll like when we send officers to raid your sister's house with guns."

On May 17, 2011, Defendant Ruiz, among others, served Plaintiff with the validation packed, dated May 17, 2011, and set forth the items of information relied upon in validating Plaintiff as a gang associate.

On this same date, Defendant Ruiz, and other prison official, concluded there was sufficient information in Plaintiff's prison file to validate Plaintiff as a gang associate.  Subsequently, an interview took place between Plaintiff and Defendant Ruiz and officer A. Mayo.  The interview consisted of defendants merely providing Plaintiff a copy of the findings.  Defendant Ruiz and Mayo did not interview Plaintiff regarding the information relied upon in reaching their validation decision.

On May 18, 2011, Defendant Ruiz, and two other officers, went to Plaintiff's cell to conduct an interview and collect a written rebuttal by Plaintiff.  Because Plaintiff was not provided a staff assistant or investigator, he was never provided a segregation hearing lock-up.  Plaintiff tried to give Defendant Ruiz a request for interview to continue the twenty-four hour notice prior to the hearing, but Ruiz refused to accept it.  When Plaintiff tried to explain to Defendant Ruiz that he misunderstood the 24-hour notice, Ruiz became upset and yelled for Plaintiff's written rebuttal.  Ruiz tried to conduct a verbal interview knowing Plaintiff was not prepared to refute the items being used for validation.  Defendant Ruiz stated "Okay [we] will see how you like it when you['re] validated and I'll make sure you['re] kept on single cell status while you['re] in the SHU validated," and then stormed off.

On May 18, 2011, Defendant Ruiz confirmed the gang associate label placed on Plaintiff.

///

4

On May 25, 2011, Plaintiff appeared at another classification committee review where it was decided that Plaintiff would be retained in administrative segregation pending confirmation of the gang associate label.

On July 21, 2011, Plaintiff appeared at another classification committee review and Plaintiff informed officials that he was not allowed to previously submit his written rebuttal. A due process violation was noted and Plaintiff was retained in administrative segregation.

On July 28, 2011, Plaintiff appeared at another classification committee review and it was noted that the validation package submitted by Defendant Ruiz violated Plaintiff's due process rights. Plaintiff was informed he would be allowed to submit his written rebuttal.

On September 1, 2011, officer Mayo handed Plaintiff a validation packet stating "refute that." Mayo told Plaintiff he did not know why he was being validated as he was "just cleaning up Lt. D.J. Ruiz fucken mess."

On September 6, 2011, officer Mayo collected Plaintiff's written rebuttal.

On September 9, 2011, another gang validation review was conducted and a new validation packet was submitted. Plaintiff was not properly advised of the existence of certain information within the validation packet, and Plaintiff contends such information is false.

On December 29, 2011, Plaintiff appeared at another classification committee review. On February 23, 2011, Plaintiff was imposed an indeterminate term in the Security Housing Unit.

### B.    Statement of Undisputed Facts[1]

1.    On April 13, 2011, Plaintiff's cellmate assaulted him when they were housed on Facility 3A, a general population yard, at California State Prison-Corcoran (COR). Plaintiff's cellmate was a Southern Mexican affiliate. (Crime/Incident Report Log No. COR-03A-11-04-0200, attached to Esquivel Decl. Ex A; Ruiz Decl. ¶ 4.)

---

[1] Although Plaintiff filed an opposition, Plaintiff neither filed his own separate statement of disputed facts nor admitted or denied the facts set forth by defendant as undisputed. Local Rule 56-260(b). Therefore, Defendant's statement of undisputed facts is accepted except where brought into dispute by Plaintiff's verified complaint and opposition. Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998).

2.     Plaintiff had several injuries consistent with having been stabbed.  He alerted staff to his injuries.  He was taken to the prison hospital and subsequently transferred to an outside facility for further treatment due to the seriousness of his injuries. (Crime/Incident Report Log No. COR-03A-11-04-0200; Pl. Dep. 54:15-58:4, attached to Esquivel Decl. Ex. K.)

3.     Plaintiff was placed in administrative segregation after he was discharged from the prison hospital.  (Pl.'s Dep. 60:21-61:25; Administrative Segregation Unit Placement Notice, dated April 16, 2011, attached to Esquivel Decl. Ex. B, 1; Ruiz Decl. ¶ 4.)

4.     On April 20, 2011, Plaintiff appeared before the classification committee for his initial review, and the committee retained Plaintiff in administrative segregation and referred his case factors to the IGI Unit for an investigation into possible safety concerns.  (Pl. Dep. 61:21-62:12; Classification Chrono, dated April 20, 2011, attached to Esquivel Decl. Ex C, 1-2.)

5.     Normally, unlawful activity within the prison was investigated by the prison's Institution Services Unit.  However, when unlawful activity occurred, or was suspected to have occurred, as a result of or in furtherance of gang activity, the IGI unit investigated the matter.  (Ruiz Decl. ¶ 6.)

6.     In Plaintiff's case, a confidential informant notified staff that Plaintiff was set up and targeted for assault.  The IGI unit was therefore assigned to investigate Plaintiff's possible safety concerns.  (Ruiz Decl. ¶ 6.)

7.     In late April 2011, Defendant Ruiz, a Lieutenant with the IGI unit, interviewed Plaintiff to ascertain if he had safety concerns.  (Ruiz Decl. ¶ 7; Pl. Dep. 78:18-22, 79:22-80:1.)

8.     The day before Ruiz met with Plaintiff, Ruiz reviewed Plaintiff's central file, including the confidential portion of his file.  (Ruiz Decl. ¶ 8.)

9.     Ruiz's research of the central file disclosed that Plaintiff's activities within CDCR had been monitored for several years, and Plaintiff was suspected of trafficking drugs for the Southern Mexican disruptive group and/or the Mexican Mafia (EME), a recognized prison gang.  (Ruiz Decl. ¶ 8.)

6

10.     Plaintiff's confidential file also disclosed that he had problems with the EME for dealing with African-American inmates.  It was well known within the law enforcement and gang-suppression community that inmates associated with the Southern Mexican disruptive group and/or EME prison gang were prohibited from conducting drug-dealing activities with Black inmates while in prison.  (Ruiz Decl. ¶ 8.)

11.     During the April 2011 interview, Ruiz asked Plaintiff if he had any safety concerns and if he was fearful for his life.  He denied both.  He also indicated that he wanted a cellmate and that "any Southerner will do."  Plaintiff was short and evasive with his responses, but was insistent that he wanted to return to the general population yard.  (Ruiz Decl. ¶ 9; Pl. Dep. 80:2-7, 82:6-20.)

12.     Based on Plaintiff's responses and demeanor, Ruiz got the impression that Plaintiff wanted to return to the yard and take his "beating" for whatever he did to curry disfavor with the Southern Mexican and/or the EME.  (Ruiz Decl. ¶ 9.)

13.     Plaintiff's attitude during the interview caused Ruiz concern because: (1) Ruiz suspected that Plaintiff was at risk of further assault if he returned to the yard, and (2) it caused Ruiz to question the level of Plaintiff's involvement in the unlawful activities of the EME or Southern Mexicans.  (Ruiz Decl. ¶ 9.)

14.     Although Ruiz does not recall searching Plaintiff's cell immediately following the April 2011 interview, Ruiz's customary practice was to search or order a search of the inmate's cell during or after an interview.  (Ruiz Decl. ¶ 10; Pl. Dep. 82:18-83:2.)

15.     Ruiz documented his investigation into Plaintiff's safety concerns, the April 2011 interview with him, and his conclusion that Plaintiff had safety concerns in a confidential memorandum dated May 3, 2011.  (Ruiz Decl. ¶ 3.)

16.     Based on Ruiz's interview with Plaintiff, Ruiz continued his investigation into Plaintiff's possible gang-related activities, including taking pictures of Plaintiff, and determined that there was sufficient evidence to submit a validation package to the Office of Correctional Safety (OCS), who ultimately decided if sufficient evidence

1    existed to validate an inmate as a prison gang member or associate.  (Ruiz Decl. ¶¶ 2,
2    11; Pl. Dep. 87:2-15, 89:13-90:21.)

3    17.    On May 16, 2011, Ruiz prepared five Confidential Information Disclosure Forms
4    (CDC 1030).  The CDC 1030s summarized information contained in the confidential
5    memorandums, dated December 6, 2005, October 7, 2007, November 13, 2007, April
6    27, 2009, and November 29, 2010, provided by informants or prison-gang drop outs
7    about Plaintiff's and other inmates' gang-related activities.  (Ruiz Decl. ¶ 11; Ruiz's
8    Confidential Disclosure Forms, attached to Esquivel Decl. Ex. D, 4-9; see also Esquivel
9    Decl. Ex. J.)

10   18.    On May 17, 2011, around 9 a.m., Ruiz and officer Garcia went to Plaintiff's cell, and
11   provided him with the following: the five CDC 1030s Ruiz authored; two CDC-128B
12   chronos, dated June 3 and 4, 2008, concerning suspect material found in Plaintiff's
13   possession; and the Evidence Disclosure/Interview Notification Chrono (CDC 128-B),
14   dated May 17, 2011, that listed the evidence to be used to validate Plaintiff, the
15   interview process, and the inmate's option to submit a written rebuttal to the evidence.
16   (Ruiz Decl. ¶ 12; Pl. Dep. 94:5-11, 97:16-99:12; Ruiz's Validation Documents,
17   attached to Esquivel Decl. Ex D.)

18   19.    Plaintiff did not inform Ruiz that he did not understand the gang validation process.
19   (Ruiz Decl. ¶ 12; Pl. Dep. 96:15-97:15, 100:7-11.)

20   20.    Plaintiff did not request a staff assistant or investigative employee to assist him with the
21   validation process when Ruiz and Garcia were at his cell on May 17, 2011.  (Pl. Dep.
22   104:2-6.)

23   21.    Plaintiff reviewed the material Ruiz gave him and prepared a written rebuttal.  On the
24   night of May 17, 2011, he mailed out the documents, including his written rebuttal, to
25   be photocopied.  (Pl. Dep. 101:1-21, 103:3-6.)

26   22.    Ruiz and Garcia returned to Plaintiff's cell on May 18, 2011, around 11:30 a.m., to
27   interview Plaintiff in connection with the validation process.  (Ruiz Decl. ¶ 13; Pl. Dep.
28   104:15-24.)

23. During the interview, Plaintiff stated that he did not have a written response and that he had sent the documents to another facility to be copied. (Ruiz Decl. ¶ 13; Pl. Dep. 105:3-106:3.)

24. Despite not having a written response, Ruiz asked Plaintiff if he had a response to each source (the five CDC 1030s and the two 2008 chronos) of evidence that would be used to validate him, and Ruiz documented Plaintiff's responses. The interview lasted about fifteen minutes. (Ruiz Decl. ¶¶ 13-14; Pl. Dep. 106:13-23, 107:19-108:15; Interview Form, attached to Esquivel Decl. E, 1-2.)

25. After the interview with Plaintiff, Ruiz prepared a Gang Validation Chrono, documenting the interview and opinions about the responses Plaintiff provided to the validation material. Ruiz also prepared an Informative Chrono (Gang Status), noting that there was sufficient evidence to submit Plaintiff's gang validation package to the OCS for consideration to validate him as an associate of the EME prison gang. (Ruiz Decl. ¶ 15.)

26. Plaintiff appeared before the classification committee on May 25, 2011, where the committee decided to retain him in administrative segregation pending the gang validation process. (Classification Chrono, dated May 25, 2011, attached to Esquivel Decl. Ex. C, 3.)

27. On June 20, 2011, the OCS validated Plaintiff as an associate of the EME prison gang. (SSU Gang Validation/Rejection Review (CDC 128-B-2), dated June 20, 2011, attached to Esquivel Decl. Ex. I, 1.)

28. The OCS validation chrono reflected five confidential sources dated December 16, 2006, October 10, 2007, November 13, 2007, April 27, 2009, and November 29, 2010. (SSU Gang Validation/Rejection Review (CDC 128-B-2), dated June 20, 2011.)

29. The July 21, 2011 classification committee determined that a due-process error occurred in connection with Plaintiff's validation because he had not received CDC 1030s concerning the December 16, 2005 and October 10, 2007 confidential memorandums identified in the OCS validation chrono. The committee retained

9

1   Plaintiff in administrative segregation pending an investigation into this error.

2   (Classification Chrono, dated July 21, 2011, attached to Esquivel Decl. Ex. C, 4.)

3   30.   On July 28, 2011, Plaintiff appeared before the classification committee where the

4   committee explained that typographical errors appeared on the OCS June 20, 2011

5   validation chrono—the confidential memorandums submitted to OCS were in fact

6   dated December 6, 2005 and October 7, 2007, not December <u>16</u>, 2005 and October <u>10</u>,

7   2007 as stated in the OCS validation chrono.  The committee retained Plaintiff in

8   administrative segregation pending the IGI unit's resubmission of his validation

9   package to the OCS, including any rebuttal statement from Plaintiff.  (Classification

10   Chrono, dated July 28, 2011, attached to Esquivel Decl. Ex. C, 5-6; Pl. Dep. 123:8-25,

11   125:2-13.)

12   31.   On September 1, 2011, officer Mayo served Plaintiff with the following documents:

13   five CDC 1030s, referencing confidential memorandums dated December 6, 2005,

14   October 7, 2007, November 13, 2007, April 27, 2009, and November 29, 2010; two

15   CDC-128B chronos, dated June 3 and 4, 2008; and the Evidence Disclosure/Interview

16   Notification Chrono (CDC 128-B), dated September 1, 2011.  (Mayo Validation

17   Documents, attached to Esquivel Decl. Ex. F; Pl. Dep. 127:20-128:2, 129:5-130:10.)

18   32.   On September 6, 2011, officer Mayo returned to Plaintiff's cell, listened to Plaintiff's

19   disagreement with the evidence, and accepted Plaintiff's written rebuttal that he had

20   prepared on May 17, 2011.  (Pl. Dep. 125:10-23, 132:15-19, 132:25-134:16; Plaintiff

21   Written Rebuttal, attached to Esquivel Decl. Ex. G.)

22   33.   Plaintiff had no further evidence or response to the validation package than what he

23   provided to officer May on September 6, 2011.  (Pl. Dep. 143:14-144:3.)

24   34.   Officer Mayo reviewed and considered Plaintiff's response and evidence, and

25   determined there was sufficient evidence to submit the validation package to the OCS.

26   (Gang Validation Chronos, dated September 6, 2011, attached to Esquivel Decl. Ex. H.)

27

28

35.     On October 20, 2011, the OCS validated Plaintiff as an associate of the EME prison gang.  (SSU Gang Validation/Rejection Review (CDC 128-B-2), dated October 20, 2011, attached to Esquivel Decl. Ex. I, 2.)

36.     On December 29, 2011, Plaintiff appeared before the classification committee that recommended retaining him in administrative segregation pending approval of his transfer to a security housing unit (SHU) for an indeterminate term.  (Classification Chrono, dated December 29, 2011, attached to Esquivel Decl. Ex. C, 7.)

37.     The Classification Staff Representative agreed with the committee's recommendation to keep Plaintiff in administrative segregation but for purposes of correcting the October 20, 2011 OCS validation chrono that had an error.  (CSR Action, dated January 25, 2012, attached to Esquivel Decl. Ex. C, 8.)

38.     On February 1, 2012, the OCS issued a correct gang validation chrono to reflect that the October 7, 2007 confidential source was a "Confidential 128B," and not a "Confidential Memorandum" as stated in the October 20, 2011 validation chrono. (CORRECTED SSU Gang Validation/Rejection Review (CDC 128-B-2), dated February 1, 2012, attached to Esquivel Decl. Ex. I, 3.)

39.     The February 23, 2012 classification committee retained Plaintiff in administrative segregation pending his transfer to the SHU.  (Classification Chrono, dated February 23, 2012, attached to Esquivel Decl. Ex. C, 9-10.)

40.     As a result of Plaintiff's validation as an associate of the EME prison gang, he was given an indeterminate SHU term on March 21, 2012.  (CSR Action, dated March 21, 2012, attached to Esquivel Decl. Ex. C, 11.)

41.     In this lawsuit, Plaintiff contends that Ruiz violated his due-process rights in connection with his placement and retention in administrative segregation, his validation as an associate of the EME prison gang, and his placement in the SHU.  (Pl. Dep. 40:23-41:16.)

42.     The December 6, 2005 confidential memorandum memorialized an intercepted note that discussed Plaintiff's involvement in providing illegal narcotics to members of the

11

EME at California State Prison-Sacrament (SAC).  (Memorandum, attached to Esquivel Decl., Ex. J, 1-3.)

43.     The October 7, 2007 confidential chrono identified Plaintiff as a member of the "mesa," a group of Southern Hispanics who conduct daily business on behalf of EME members), on the yard at SAC.  (Confidential Chrono, attached to Esquivel Decl. Ex. J, 4.)

44.     The November 3, 2007 confidential memorandum identified Plaintiff as having established a mailbox for EME members to forward money collected from the sale of narcotics during his incarceration at SAC.  (Memorandum, attached to Esquivel Decl. Ex. J, 5-7.)

45.     The April 27, 2009 confidential memorandum identified Plaintiff as an individual the EME members at SAC trusted to collect information on active Southern Mexicans on the yard.  (Memorandum, attached to Esquivel Decl. Ex. J, 8-11.)

46.     The November 29, 2010 confidential memorandum identified Plaintiff as an associate of the EME and who assisted with the introduction of illegal narcotics on the yard at SAC.  (Memorandum, attached to Esquivel Decl. Ex. J, 12-14.)

C.      **Due Process Challenges to Gang Validation Procedure**

Defendants move for summary judgment because: (1) Ruiz was not involved in the decision to place and retain Plaintiff in administrative segregation from April 2011 to March 2012; (2) Plaintiff was provided ample notice and an opportunity to present his disagreement with the gang validation packed prepared by Ruiz and the validation decision was supported by some evidence, and (3) Ruiz is entitled to qualified immunity.[2]

The Due Process Clause protects prisoners from being deprived of liberty without due process of law.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  The Due Process Clause itself does not confer on inmates a liberty interest in being confined in the general prison population instead of

---

[2] Defendant Ruiz also moved for summary judgment on Plaintiff's claim of retaliation; however, Defendant Ruiz appropriately moved to withdraw such argument in his reply as that claim was previously dismissed for failure to exhaust the administrative remedies.  (ECF Nos. 65, 76, 85, 86, 106.)

1  segregation. See Hewitt v. Helms, 459 U.S. 460, 466-68 (1983).  Liberty interests created by state law

2  are limited to freedom from restraint which "imposes atypical and significant hardship on the inmate

3  in relation to the ordinary incidents of prison life."  Sandin v. Conner, 515 U.S. 472, 484 (1995).

4          In 2011, when Plaintiff was validated an associate gang member, the California regulations,

5  required the validation of a prisoner as a gang member or associate to be based upon three or more

6  independent "source items of documentation" that are "indicative of" actual membership" or

7  "association with" validated gang members or associates.  Cal. Code Regs., tit. 15, § 3378(c)(3), (4).

8  At least one of the source items must "be a direct link to a current or former validated member or

9  associate of the gang, or to an inmate/parolee or any person who is validated by the department within

10  six (6) months of the established or estimated date of activity identified in the evidence considered."

11  Id., § 3378(c)(4).  An inmate who is the subject of a gang validation investigation must be informed of

12  each source items and provided all non-confidential information, not less than 24 hours before the

13  inmate is provided an interview, and an opportunity to be heard.  Id., § 3378(c)(6)(B), (C).  The

14  interview must be documented and include a record of the inmate's opinion concerning each source

15  items.  Id., § 3378(c)(6)(D).  The inmate's mental health status and need for staff assistance must be

16  evaluated and, if necessary, accommodated prior to the interview."  Id., § 3378(c)(6)(F).

17          However, the standards are less stringent when a federal district court assesses the reliability of

18  evidence underlying a California prison's validation decision.  An inmate's gang validation and related

19  transfer to security placements will meet federal due process requirements if the inmate is provided

20  only notice of the charges and evidence against him, an informal hearing with the opportunity to

21  present his views, and "some evidence" supporting the decision.  Bruce v. Ylst, 351 F.3d 1283, 1287-

22  1288 (9th Cir. 2003).  "California's policy of assigning suspected gang affiliates to the Security

23  Housing Unit is not a disciplinary measure, but an administrative strategy designed to preserve order

24  in the prison and protect the safety of all inmates.  Although there are some minimal legal limitations,

25  the assignment of inmates within the California prisons is essentially a manner of administrative

26  discretion."  Munoz v. Rowland, 104 F.3d at 1098 (citation omitted).  Thus,

27          [W]hen prison officials initially determine whether a prisoner is to be segregated for
            administrative reasons due process only requires the following procedures: Prison
28

13

officials must hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated.  The prison officials must inform the prisoner of the charges against the prisoner or their reasons for considering segregation.  Prison officials must allow the prisoner to present his views.

Toussaint v. McCarthy, 801 F.2d 1080, 1100-1101 (9th Cir. 1986) (fn omitted).

       1.    Placement and/or Retention in Administrative Segregation or the SHU

The placement and/or retention in administrative segregation may or may not deprive a prisoner of a liberty interest, however, in this instance the Court need not determine whether Plaintiff's eleven-month placement in administrative segregation pending validation and his subsequent placement in the SHU deprived him of a liberty interest.  Even assuming Plaintiff's placement subjected him to "atypical and significant hardship," Ruiz did not order his initial placement in administrative segregation, nor was he involved in Plaintiff's continued retention in administrative segregation or subsequent transfer to the SHU.  (Administrative Segregation Unit Placement Notices, attached to Esquivel Decl. Ex. B; Classification and CSR Chronos, attached to Esquivel Decl. Ex. C.)

In order to pursue a claim under section 1983 based on an evidentiary or procedural challenge, plaintiff must allege facts linking the evidentiary or procedural deficiencies to the individual(s) who made the decision to place and/or retain Plaintiff in administrative segregation and the SHU.  See West v. Atkins, 487 U.S. 42, 48 (1988); Crumpton v. Gates, 947 F.2d 1418, 1420 (9th Cir. 1991).  A person deprives another of a constitutional right under § 1983 only if he "does an affirmative act, participates in another's affirmative acts," or fails to perform a legally required duty which "causes the deprivation of which" the plaintiff complains.  Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988).  A plaintiff must demonstrate that the official was the "moving force" behind the constitutional deprivation.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  Plaintiff must show that the specific prison official, in acting or failing to act, violated his constitutional rights and that the official's conduct was the actual and proximate cause of the deprivation of plaintiff's constitutional rights.  Leer, 844 F.2d at 634; Arnold v. IBM Corp., 637 F.2d 1350, 1355 (9th Cir. 1981) (plaintiff must show that defendants caused his injury); Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008) (plaintiff must demonstrate defendant's conduct was the actionable cause of the claimed injury).

14

1    Defendant has submitted evidence to demonstrate that he (Ruiz) did not issue any of the lock-

2    up orders or participate in any of the classification committees that resulted in Plaintiff's placement in

3    administrative segregation, his continued detention therein, or his subsequent transfer to the SHU.

4    (See Administrative Segregation Unit Placement Notices, dated April 16, 2011, May 17, 2011, and

5    December 2, 2011, attached to Esquivel Decl., Ex. B; Classification Chronos and Classification—CSR

6    Action Chronos from April 2011 to March 2012 from Plaintiff's central file, attached to Esquivel

7    Decl., Ex. C.)

8    In opposition, Plaintiff argues that summary judgment is not warranted because it was Ruiz's

9    decision to proceed with the validation process, Ruiz's decision to proceed and investigate Plaintiff,

10   and in turn retain Plaintiff in administrative segregation and subsequent placement in the SHU for an

11   indeterminate term.  (Opp'n at 2.[3])  Plaintiff argues that the May 18, 2011, Informative Chrono

12   demonstrates that Ruiz retained him in administrative segregation.  (Opp'n at 82.)  The May 18, 2011,

13   chrono states as follows: "On April 27, 2011, California State Prison-Corcoran's Institutional Gang

14   Investigators Unit initiated an investigation on inmate VALENCIA, Spooky from Vickys Town, for

15   the purpose of clarifying his current gang status with the prison gang known as the Mexican Mafia

16   (EME).  At this time there is sufficient documentation/evidence to submit a gang validation package to

17   the Office of Correctional Safety (OCS) in Sacramento, in an attempt to validate VALENCIA as an

18   associate of the EME prison gang.  Inmate Valencia should not be transferred until his validation

19   investigation is complete."  (Opp'n at 82.)  As Ruiz declares, at the time that Plaintiff's "case factors

20   came to my attention around April 20, 2011, [Plaintiff] was already in administrative segregation."

21   (Ruiz Decl. ¶ 18.)  Ruiz's May 18, 2011, chrono was a recommendation that the classification

22   committee and Classification Staff Representative (CSR) were free to ignore, and Ruiz specifically

23   noted that Plaintiff "should not" be transferred.  (Opp'n at 82.)

24   Plaintiff has submitted no evidence to demonstrate that Ruiz was involved in the classification

25   committees wherein it was recommended to retain Plaintiff in administrative segregation, that Ruiz

26

27   _____

     [3] References herein to page numbers are to the Court's ECF pagination headers.

28

1   issued any lock-up order to place or retain Plaintiff in administrative segregation, or that Ruiz had

2   authority to determine Plaintiff's housing placement.  Thus, there is no genuine issue of material fact

3   that Ruiz was involved in or made Plaintiff's housing determinations, and Defendant Ruiz's motion

4   for summary judgment should be granted on Plaintiff's due-process relating to his placement and

5   retention in administrative segregation.

6          2.     <u>Procedural Protections in Connection with Gang Validation</u>

7          Defendant does not dispute that being validated as a prison gang associate, resulting in an

8   indeterminate SHU term, implicates a liberty interest.  Defendant argues, however, that Plaintiff was

9   afforded all the process to which he was due.

10          Here, the undisputed evidence shows that Ruiz was a Lieutenant with the IGI unit.  (Ruiz Decl.

11   ¶ 7; Pl. Dep. 78:18-22, 79:22-80:1.)  On May 17, 2011, Ruiz served Plaintiff with the gang validation

12   package, including the CDC 1030 disclosure forms.  (UF[4] 17-18, 42-46, Compl. ¶ 28.)  In addition,

13   Ruiz interviewed Plaintiff for approximately fifteen minutes on May 18, 2011, and obtained Plaintiff's

14   responses to the documentation, which was taken into consideration by Ruiz in rendering a final

15   determination whether to forward the validation package to the OCS.  (UF 24-25.)  Plaintiff, therefore,

16   received timely notice and an adequate opportunity to respond to the validation package prior to his

17   validation as an associate of the EME prison gang.  (UF 22-30, 32.)

18          In opposition, Plaintiff argues that his due-process rights were violated because Ruiz did not

19   continue the interview to allow Plaintiff to submit his written rebuttal prior to the validation package

20   being forwarded to the OCS.  Contrary to Plaintiff's claim, no such due process requirement exists.

21   While Plaintiff may be frustrated that he was unable to submit his written rebuttal prior to Ruiz's gang

22   validation recommendation, such rebuttal was not constitutionally required to satisfy due process

23   under these circumstances.  It is undisputed that Plaintiff was provided notice of the charges on May

24   17, 2011.  By Ruiz allowing Plaintiff the opportunity to present his views and object to the evidence

25   being used to support his validation, Ruiz satisfied the requirement that Plaintiff be given an

26   opportunity to be heard by the decisionmaker.  See <u>Madrid v. Gomez</u>, 889 F.Supp. 1146, 1273 (N.D.

27

28   _____

    [4] "UF" refers to the Statement of Undisputed Facts set forth above in section III, B.

Cal. 1995).  Although Plaintiff claims he informed Ruiz he was not ready to proceed because he did not have a copy of his rebuttal, Plaintiff admitted that he answered Ruiz's questions when asked about his opinion or response to each source of evidence that would be used against him.  (UF 24.)

In any event, even if Ruiz was required to wait for Plaintiff's written rebuttal, Ruiz's failure to do so did not result in a due-process violation in this instance because the gang validation was voided before it took effect.  After the validation was submitted by Ruiz, the classification committee noted certain typographical errors in the OCS June 20, 2011 gang validation chrono, and ordered that an entirely new validation package be issued, which resulted in a subsequent interview with Plaintiff where he was provided the opportunity to voice his disagreement with the evidence sources and submit his written rebuttal.  (UF 27-34.)  The OCS found sufficient evidence to validate Plaintiff and issued a new, and a corrected, gang validation chrono, which resulted in Plaintiff's placement in the SHU in March 2012.  (UF 35-40.)  Thus, there is no action or inaction by Ruiz which resulted in Plaintiff being deprived of a liberty interest.  See Lerr v. Murphy, 844 F.2d at 634; Daniels v. Gilbreath, 668 F.2d 477, 488 (10th Cir. 1982).  Indeed, the classification of Plaintiff as a gang associate by Defendant Ruiz was not "constitutionally significant."  Hart v. Cambra, No C 96-0924 SI, 1997 WL 564059, at *4 (N.D. Cal. Aug. 22, 1997).  Rather, it was the decision to confine Plaintiff to the SHU indefinitely based on this classification that raised constitutional concerns.  Id.

In opposition, Plaintiff argues that he was not provided a staff assistant during the gang-validation process.  However, Plaintiff has failed to submit evidence that he was entitled to a staff assistant.  In addition, Plaintiff admitted that he never requested a staff assistant from Ruiz on May 17, 2011.  (Pl. Dep. 104:2-6.)  Plaintiff further acknowledged that he was not a mental-health participant in 2011.  (Id. 35:23-36:4.)  In May 2011, Plaintiff had a TABE source of 9.9.[5]  (Esquivel Decl. Ex. E at 3, ECF No. 85-4 at 38.)  Plaintiff has submitted no evidence that he ever informed Defendant that he did not understand the documentation Ruiz provided to him on May 17, 2011, that he did not understand what he was supposed to do with the material, or that he did not understand the validation

---

[5] TABE stands for "Test of Adult Basic Education," which measures an inmate's ability to understand and participate in the disciplinary process.  See Cal. Code of Reg., tit. 15, § 3000 (defining "effective communication").  When an inmate has a TABE score of 4.0 or below, prison staff must assess whether the inmate requires a Staff Assistant.  Id.

process.  To the contrary, the undisputed evidence demonstrates that Plaintiff understood the process and prepared a written rebuttal to the validation package Ruiz provided to him.  (UF 19-20.)

Furthermore, Plaintiff's contention that his due process rights were violated because he never received a Rules Violation Report is without merit.  The fact that Plaintiff has never received a Rules Violation Report does not run afoul of the Due Process Clause.  Due process requires only that the prisoner be informed of the charges against him or the reasons for segregation.  Toussaint, 801 F.2d at 1100-1101.  Thus, prison officials are not required to issue Plaintiff a CDC-115 Serious Rules Violation Report in order to satisfy due process.

To the extent Plaintiff argues that certain procedural and/or substantive aspects of the California Code of Regulations were violated, such claim is not viable in this action.  As previously stated, the California regulations do not dictate the outcome of the federal due process analysis.  In addition, Title 15 of the California Code of Regulations governing the conducting of officials does not entitle an inmate to sue civilly for a violation.  See, e.g., Vasquez v. Tate, No. 1:10-cv-01876-JLT (PC), 2012 WL 6738167, at *9 (E.D. Cal. Dec. 28, 2012); Davis v. Powell, 901 F.Supp.2d 1196, 1211 (S.D. Cal. 2012).  Accordingly, any claim by Plaintiff that the regulations were not followed, standing alone, fails to state a claim for relief.

Because no factual dispute exists that Plaintiff received the process for which he was due in relation to his gang validation, summary judgment should be granted in favor of Ruiz on this claim.

3.    Some Evidence to Support Gang Validation Decision

Plaintiff contends there was insufficient evidence to validate him as an associate of the EME prison gang.

Due process also requires that there be an evidentiary basis for the prison officials' decision to place an inmate in segregation for administrative reasons.  Superintendent v. Hill, 472 U.S. 445, 455 (1985); Toussaint, 801 F.2d at 1104-1105; Madrid v. Gomez, 889 F.Supp. 1146, 1273 (N.D. Cal. 1995).  This standard is met if there is "some evidence" from which the conclusion of the administrative tribunal could be deduced.  Id.  Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighting of the evidence.  Instead, the relevant question is whether there is any evidence in the record

that could support the conclusion reached by the disciplinary board." Hill, 472 U.S. at 455-456. "The

fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside

decisions of prison administrators that have some basis in fact." Id. at 456. A due process violation

can be shown if after a review of the record in the light most favorable to upholding the agency's

decision is devoid of evidence to support the decision to revoke the good time credits. Id. at 457.

Contrary to Plaintiff's argument, there is some evidence with "some indicia of reliability" to

support his validation as an associate of the EME prison gang. The following five confidential source

items were used to demonstrate Plaintiff's gang validation: (1) a "kite" addressed to Plaintiff which

contained information about the EME and Plaintiff's involvement in providing illegal drugs to EME

members; (2) an informant identified Plaintiff as a member of the EME "mesa" (decision-making

body) on the yard and with whom the informant spoke to about getting in good standing with the EME

on the yard; (3) an informant identified Plaintiff as maintaining a mail box used for drug transactions

and selling drugs on the yard; (4) an informant, a validated associate of the EME, identified Plaintiff

as the person who assisted him (the informant) in orchestrating a drug deal and whom he ordered to

collect information on other inmates; and (5) an informant, a validated associate of the EME,

identified Plaintiff as assisting in the introduction of illegal narcotics for the purpose of generating

revenue for the EME. (UF 17-18, 31.) The information was deemed reliable because the informants

incriminated themselves and the information was corroborated by other sources. (UF 42-46.); see, e.g.,

Dorrough v. Ruff, 552 Fed. App'x 728, 729-730 (9th Cir. 2014) (stating that indicia of reliability

established with proof that part of the information provided by the sources had already proven to be

true and the sources incriminated themselves in criminal activity at the time of providing the

information). In addition to the confidential information, Plaintiff had possession of two drawings

which had been altered or manipulated to display symbols utilized by the EME to show a person's

allegiance to the prison gang. (Id.); see, e.g., Castro v. Terhune, 712 F.3d 1304, 1315 (9th Cir. 2013)

(finding that inmate's possession of two pictures containing gang-related symbols constituted "some

evidence" that the inmate was involved with the gang in question). Plaintiff contends that the

information relied upon was false or that certain items could support a competing inference; however,

in a civil rights action, this Court may not independently assess the credibility of witnesses or evidence.

Plaintiff contends that none of the evidence supported a "direct" link as required under § 3378(c)(4) of Title 15.  Plaintiff's argument lacks merits, as confidential sources numbers 4 and 5 were current validated associates of the EME at the time they disclosed the relevant information, and based on their statements, they were in a position to hear and see Plaintiff's involvement such that they had personal knowledge of Plaintiff's activities as set forth in the confidential memorandums. (UF 45-46.)

Accordingly, the five confidential source items described in the CDC 1030s and the two chronos served on Plaintiff with the validation package(s) met the "minimally stringent" test for "some evidence" supporting the action taken by OCS and prison officials.  See, e.g., Castro, 712 F.3d at 1315.[6]

4.   Official Capacity Claim Against Kernan for Injunctive Relief

Because it is recommended herein that Defendant Ruiz's motion for summary judgment be granted in its entirety, Plaintiff's official capacity claim against Defendant Scott Kernan for injunctive relief relating to the gang validation process shall be dismissed as rendered moot.

## III.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.   Defendant Ruiz's motion for summary judgment be GRANTED in its entirety;

2.   Judgment be entered in favor of Ruiz; and

3.   Plaintiff's official capacity claim against Defendant Scott Kernan for injunctive relief be dismissed as rendered MOOT.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections

---

[6] Because the Court finds that Defendant Ruiz is entitled to summary judgment on the merits of Plaintiff's claims, there is no need to reach his alternative argument for qualified immunity.

with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **May 26, 2016**

UNITED STATES MAGISTRATE JUDGE

21